UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VIETTA L. JOHNSON, M.D., and DANIEL IVANKOVICH, M.D., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | 08 C 2139 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| COUNTY OF COOK, ROBERT R. SIMON, M.D., AARON HAMB, M.D., and CLIFFORD CRAWFORD, M.D., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| KAREN NASH, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 3648 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| COUNTY OF COOK, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion and Order**

Drs. Vietta L. Johnson, Daniel Ivankovich, and Karen Nash brought the first of these

consolidated suits (08 C 2139) against their former employer, Cook County, as well as Drs.

Robert Simon, Aaron Hamb, and Clifford Crawford, alleging First Amendment and Equal

Protection Clause violations under 42 U.S.C. § 1983 and claims under 42 U.S.C. § 1985, Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Equal Pay Act, 29 U.S.C.

§ 206(d)(1). Doc. 1 (all record citations are to Case 08 C 2139 unless otherwise indicated). Drs.

Johnson and Ivankovich then filed an amended complaint, which alleged the same claims and

terminated Dr. Nash as a plaintiff. Doc. 16. The same day, Dr. Nash filed her own suit (08 C

-1-

3648) against Cook County, alleging violations of Title VII and the Equal Pay Act. Doc. 1 (08 C 3648). The § 1985 claims have been dismissed. 2009 WL 331531 (N.D. Ill. Feb. 10, 2009) (Cox, M.J.). Defendants have moved for summary judgment on the remaining claims. Doc. 205. The motion is granted in part and denied in part.

### Background

The facts are stated as favorably to Plaintiffs as the record and Local Rule 56.1 allow. On summary judgment, the court must assume the truth of those facts but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Plaintiffs are three physicians formerly employed by the Cook County Bureau of Health. The Bureau of Health operates seven health facilities in Cook County, including Stroger Hospital and Provident Hospital. Doc. 265-1 at ¶ 10. Dr. Johnson, an African-American female, was the Director/Chair of the Division of Orthopedic and Podiatric Surgery at Provident from 1998 through 2007. *Id*. at ¶ 1. Dr. Ivankovich, a white male, was a surgeon in Provident's Division of Orthopedics from 2002 through 2007. *Id*. at ¶ 2. Dr. Nash, an African-American female, was an oral and maxillofacial surgeon at Provident from 1992 through 2007. *Id*. at ¶ 3; Doc. 265-8 at 40. The individual defendants are doctors as well. Dr. Simon was the Interim Bureau Chief of the Cook County Bureau of Health from December 2006 through mid-2008. Doc. 265-1 at ¶ 7; Doc. 265-5 at 117, 162. Dr. Crawford was Chairman of Provident's Department of Surgery and the direct supervisor of Dr. Johnson and Dr. Nash. Doc. 265-1 at ¶ 5; Doc. 269 at ¶ 40. Dr. Hamb was Provident's Chief Medical Officer. Doc. 265-1 at ¶ 6.

### I.      Bureau of Health Budget Cuts and Plaintiffs' Terminations

Cook County experienced a significant budget shortfall in 2007. Doc. 265-1 at ¶ 25. As a result, Cook County Board of Commissioners President Todd Stroger tasked Dr. Simon with

cutting the Bureau's budget. *Id*. at ¶ 26; Doc. 265-5 at 118. Dr. Simon solicited input from various Bureau doctors regarding the impact of cutting certain services. Doc. 265-1 at ¶¶ 35, 37, 50. While Dr. Simon was reviewing possible cuts, Dr. Mark Gonzalez, the chair of orthopedics at Stroger and acting bureau chair for orthopedics in early 2007, contacted Dr. Ivankovich to discuss his future at Provident. Doc. 269 at ¶ 5. Dr. Gonzalez told Dr. Ivankovich that the number of orthopedic surgeon positions at Provident would be reduced from two to one, and that "they" wanted Dr. Ivankovich to fill the single remaining position. *Ibid*. Dr. Ivankovich responded that Dr. Johnson also should be retained, but Dr. Gonzalez said that "they" did not want to keep her. *Id*. at ¶ 6. The record does not reveal to whom Dr. Gonzalez was referring by "they." Dr. Gonzalez added that women in orthopedics do not do much and that Dr. Johnson was "just another black physician troublemaker." *Ibid*.; Doc. 265-8 at 36, ¶ 5. (It bears repeating that the facts are stated in the light most favorable to Plaintiffs.)

In mid-February 2007, approximately six weeks after President Stroger first approached him, Dr. Simon submitted a proposed budget with $100 million in cuts. Doc. 265-1 at ¶ 29; Doc. 269 at ¶ 7. The budget identified which Bureau departments and positions would be retained, but did not identify which particular physicians would be retained. Doc. 269 at ¶ 1; Doc. 265-5 at 140-41. The proposed budget cut Provident's orthopedic surgical and oral and maxillofacial surgical services, with the thought that patients requiring those services could be seen at Stroger. Doc. 265-1 at ¶¶ 40, 46, 64. The Board approved Dr. Simon's proposed budget on February 23, 2007. Doc. 269 at ¶ 7.

Once the budget was approved, Dr. Simon was supposed to implement a process to determine which doctors would be retained. *Id*. at ¶ 15; Doc. 265-8 at 32, ¶ 7. Where specialities were being consolidated at one hospital, as with the consolidation of orthopedic

surgery at Stroger, all of the Bureau's doctors in that specialty were to be given the opportunity

to apply and interview for the remaining positions.  Doc. 269 at ¶ 15; Doc. 265-8 at 32, ¶ 7.

Interviews were conducted for doctors in several specialties.  Doc. 269 at ¶ 22.  The interviews

scheduled for orthopedic surgeons and for oral and maxillofacial surgeons were cancelled.  *Id*. at

¶¶ 19, 21.  According to Dr. Simon, those interviews were cancelled because those departments

would no longer exist at Provident.  *Id*. at ¶ 20-21.  But in fact the Bureau did continue to offer

some orthopedic services at Provident.  *Id*. at ¶ 13.

On April 13, 2007, Drs. Johnson, Ivankovich, and Nash were terminated.  Doc. 265-1 at

¶¶ 1-3.  Before the terminations, Dr. Simon asked Drs. Hamb and Crawford for a report on Dr.

Johnson's performance and Dr. Ivankovich's productivity.  *Id*. at ¶ 33; Doc. 265-4 at 6, 136.  Dr.

Simon did not ask for assessments of any other doctors.  Doc. 265-1 at ¶ 33; Doc. 265-4 at 6,

110.  Dr. Simon testified that he does not remember receiving assessments of Drs. Johnson and

Ivankovich, and that his decision to terminate them was not based on their individual

productivity.  Doc. 265-1 at ¶ 44; Doc. 265-5 at 156.

## II.    Plaintiffs' Speech

Prior to their terminations, Drs. Johnson and Ivankovich were publicly critical of the

proposed budget cuts.  In 2006, Dr. Johnson spoke out against the cuts at a large community

meeting at a local church.  Doc. 269 at ¶ 3.  Dr. Johnson also participated in two rallies outside

Provident to protest the cuts.  Doc. 265-1 at ¶ 93.  Local television coverage of one of the rallies

showed Dr. Johnson saying that a 50% budget cut "would be a cut to the bone."  *Ibid*.  Dr.

Johnson spoke about the community impact of the budget cuts on a local radio show, Doc. 269 at

¶ 3, during meetings with Operation PUSH, Doc. 265-1 at ¶¶ 87-88, 90, and during a Cook

County Board meeting, *id*. at ¶ 86; Doc. 209 at 141-143.  In a February 2007 *Chicago Tribune*

article titled "Why Cook hospitals are losing millions," Dr. Ivankovich was quoted as saying: "Give me a social worker and someone to help with the paperwork, and I could generate millions of dollars from Medicaid and Medicare a year." Doc. 265-4 at 201.

## III.  Work Environment

While employed at Provident, Drs. Johnson and Nash both had run-ins with Dr. Crawford, their supervisor. During an evening meeting on August 21, 2003, Dr. Johnson told Dr. Crawford that she needed to return home to relieve her babysitter. Doc. 269 at ¶ 23; Doc. 265-5 at 43. Dr. Crawford responded by asking whether her job was important to her, and then told her to "go home and be a mother." Doc. 269 at ¶ 23; Doc. 265-5 at 43. When Dr. Johnson decided to stay, Dr. Crawford threatened to physically remove her from his office and to call security. Doc. 269 at ¶ 23; Doc. 265-5 at 43. Dr. Crawford then stood up and stepped out from behind his desk, making Dr. Johnson feel physically threatened. Doc. 269 at ¶ 23; Doc. 265-5 at 43-44. Following this incident, Dr. Crawford repeatedly asked Dr. Johnson whether she had worked a forty-hour week. Doc. 265-5 at 38.

In June 2005, Dr. Johnson was involved in an operating room incident with another doctor in her division. Dr. Crawford sided with the other doctor, who was male, without first consulting Dr. Johnson about what had occurred. Doc. 269 at ¶ 25; Doc. 265-5 at 40-41. In October 2005, Dr. Crawford accused Dr. Johnson of insubordination because, when supporting two staff members during a meeting, she accused Dr. Crawford of lying. Doc. 269 at ¶ 25; Doc. 265-5 at 45-46. Also in 2005, when Dr. Johnson's patients did not appear for surgery, Dr. Crawford accused her of scheduling "ghost cases." Doc. 269 at ¶ 25; Doc. 265-5 at 38. Dr. Johnson complained about these events in a July 20, 2005 letter to Dr. Crawford regarding the

operating room incident, Doc. 265-7 at 4, and in an October 28, 2005 letter referencing that incident and others, *id.* at 20.

In August 2006, Dr. Crawford wrote Dr. Johnson a letter reprimanding her for arriving late to her clinic without giving prior notice. Doc. 210-18 at 1. Dr. Crawford did so even though Dr. Johnson had notified the clinic that she would be late due to a medical condition that required immediate care. Doc. 265-5 at 48-49. During a conversation with Drs. Ivankovich and Johnson, Dr. Crawford questioned Dr. Johnson's ability to perform difficult cases. Doc. 265-4 at 175. Dr. Ivankovich described the exchange as follows:

| | |
|---|---|
| Crawford: | Are you going to do them? You can't do those. You're not able to do those, are you? |
| Ivankovich: | Of course she can do it. |
| Johnson: | Of course I can do it. |
| Crawford: | She's not able to do it? You're not able to do it? |

*Ibid.* Dr. Ivankovich understood Dr. Crawford's statements to be "based on the fact that [Dr. Johnson] was a foot and ankle surgeon and because she went into a field that was not manly in doing spines and big hip replacements, that she was unable to do that. And I think he did pick on that as sort of a recurring theme as a—just a slight of her ability, Dr. Johnson's ability and her competence." *Ibid.*

The final incident between Dr. Johnson and Dr. Crawford occurred in January 2007. Dr. Johnson's division had refused to sign a letter regarding productivity. Doc. 265-5 at 37. Dr. Crawford told Dr. Johnson that the doctors in her division needed to be more like Dr. Jackie Harrison (a woman) and say "yes, sir" when Dr. Crawford asked them to do something. *Id.* at 36. Dr. Johnson testified that she believed Dr. Crawford's actions were hostile. *Id.* at 61.

Between 2003 and 2007, Dr. Nash "constantly" had major arguments with Dr. Crawford, some of which involved profanity. Doc. 265-5 at 101-02. In certain instances, the arguments occurred when Dr. Nash "sided with Dr. Johnson." *Id*. at 102. Dr. Nash observed similar treatment by Dr. Crawford towards Dr. Johnson, but not towards other doctors. *Ibid*.

## IV. Compensation

During their last three years at Provident, Drs. Johnson and Nash were paid less than male doctors at Stroger. Dr. Johnson was paid less than Dr. Gonzalez, the male chair of orthopedics at Stroger. Doc. 269 at ¶ 35. Dr. Ivankovich testified that Drs. Johnson and Gonzalez had equivalent duties in that both were "division chairmen for orthopedics[,] … had meetings, … had budgets," and supervised residents. Doc. 265-4 at 182, 184. Dr. Gonzalez testified that his position at Stroger was "the equivalent of the position" that Dr. Johnson held at Provident. *Id*. at 70. Stroger is a level one trauma facility while Provident is not. Doc. 265-1 at ¶ 13. The parties dispute whether the job of a non-emergency room physician doctor at a level one trauma facility is comparable to the same job at a non-level one trauma facility.

Dr. Nash was paid less than Dr. Henry Fung, a male oral and maxillofacial surgeon at Stroger. Doc. 269 at ¶ 36. Drs. Nash and Fung both trained at Stroger. *Ibid*.; Doc. 265-8 at 41. Their responsibilities included being on-call, conducting clinics, performing surgery on major oral and maxillofacial fractures and trauma, performing dentoalveolar surgery, and treating major pathology. Doc. 269 at ¶ 36; Doc. 265-8 at 41.

**Discussion**

Dr. Johnson alleges: (1) that her termination was due to race and sex discrimination in violation of Title VII and the Equal Protection Clause; (2) that her termination also was due to retaliation in violation of the First Amendment; (3) that she was subjected to a hostile work

environment in violation of Title VII; and (4) that she suffered wage discrimination in violation of Title VII and the Equal Pay Act. Dr. Nash alleges: (1) that her termination was due to race and sex discrimination in violation of Title VII; (2) that she was subjected to a hostile work environment in violation of Title VII; and (3) that she suffered wage discrimination in violation of Title VII and the Equal Pay Act. Dr. Ivankovich alleges that his termination was due to retaliation in violation of Title VII, the Equal Protection Clause, and the First Amendment. Unless otherwise noted, Defendants will be referred to collectively even though Dr. Nash's claims are brought only against Cook County and not against Drs. Simon, Crawford, and Hamb.

## I.    Wage Discrimination Claims

### A.    Equal Pay Act

Drs. Johnson and Nash allege that Defendants violated the Equal Pay Act ("EPA") by paying them less than similarly situated male colleagues. Specifically, Dr. Johnson claims that she was paid less as chair of orthopedics at Provident than Dr. Gonzalez, a male, was paid as chair of orthopedics at Stroger. Dr. Nash claims that she was paid less as an oral and maxillofacial surgeon at Provident than Dr. Henry Fung, a male, was paid as an oral and maxillofacial surgeon at Stroger.

"The EPA prohibits employers from paying employees different wages based on gender." *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). "To establish a prima facie case of wage discrimination under the EPA, [Johnson and Nash] must show that: (1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998). "'Skill' includes … such factors as 'experience, training, education, and ability.'" *Id*. at 686 (quoting 29 C.F.R. § 1620.15(a)).

"[T]he comparison at this juncture is between positions, not individuals." *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 699 (7th Cir. 2003).

Defendants argue that Plaintiffs cannot satisfy the second and third prongs because the work performed by doctors at Provident, a non-level one trauma facility, does not require substantially similar skill and effort to the work performed by doctors at Stroger, a level one facility. Defendants' argument fails, at least at the summary judgment stage. True, Defendants offer evidence tending to show that the cases handled at Stroger were different from those handled at Provident. Doc. 265-1 at ¶¶ 15, 16, 18; Doc. 227 at 70, 104. But Plaintiffs counter with an expert report from Dr. John Fairman, who opines that doctors at level one facilities are not required to "have heightened skills, credentials, or experience, as compared to doctors at other hospitals." Doc. 265-9 at 3. Dr. Fairman also opines that the mere fact that a hospital is a level one facility "does not mean that the doctors work harder … [or] … that the doctors handle more complex cases in any significant numbers." *Ibid.* Dr. Fairman's opinion is based on his 27 years of experience working in health care administration, including a brief period as Provident's Chief Operating Officer. *Id.* at 2, 10. Although Defendants object to Plaintiffs' use of Dr. Fairman's expert report, Doc. 270 at 19, the objection is forfeited because Defendants fail to develop a legal argument or to cite any supporting authority. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). In any event, Dr. Nash herself testified that the dental clinic and the oral and maxillofacial surgery services at Provident and Stroger were comparable. Doc. 265-5 at 101.

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Shaffer v. Am. Medical Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) (internal quotation marks omitted). Because there is a genuine dispute as to whether doctors at a level one facility perform work that requires substantially similar skill, effort, and responsibilities to the work performed by doctors at a non-level one facility, summary judgment on the EPA claims is denied.

####    B.    Title VII

Drs. Johnson and Nash also allege sex-based wage discrimination in violation of Title VII. Although Defendants' initial brief sets forth the legal requirements for a Title VII wage discrimination claim, its substantive argument addresses only the EPA claims. Doc. 239 at 13-16. If Title VII and EPA were equivalent with respect to wage discrimination, this would not be a problem. But they are not equivalent, as a defendant entitled to summary judgment on an EPA claim still can be liable for wage discrimination under Title VII based on the same conduct. *See Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 524-25 (7th Cir. 1994) ("Even when jobs are not sufficiently similar to constitute 'equal work' under the Equal Pay Act, a Title VII claim for wage discrimination is not precluded."). Accordingly, even though Defendants substantively address the Title VII wage discrimination claim in their reply brief, any challenge to that claim on summary judgment is forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

## II.    Hostile Work Environment Claims

Drs. Johnson and Nash claim that they were subjected to a hostile work environment, in violation of Title VII, due to sex-based harassment and mistreatment by Dr. Crawford. To

survive summary judgment on these claims, Drs. Johnson and Nash must demonstrate: "(1) that [their] work environment was both objectively and subjectively offensive; (2) that the harassment was based on [their sex]; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 2012 WL 1522014, at *3 (7th Cir. 2012). "Although sexual harassment is usually thought of in terms of sexual demands, it can include employer action based on [sex] but having nothing to do with sexuality." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (quoting 3 Lex K. Larson, Employment Discrimination § 46.01[3] (2d ed. 2000)).

Dr. Johnson's evidence, which is set forth in the Background section and will not be repeated here, shows that Dr. Crawford took a handful of actions over a three-year period that she considered "hostile" and that he also repeatedly questioned whether she worked a forty-hour week. Dr. Johnson's hostile work environment claim fails because no reasonable jury could find that the conduct in question—only some of which was based on sex—was severe or pervasive.

Title VII does not impose a "general civility code," and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). Relevant considerations include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Applying this standard in *Scruggs v. Garst Seed Co.*, 587 F.3d 832 (7th Cir. 2009), the Seventh Circuit affirmed a grant of summary judgment on a hostile work environment claim where the plaintiff's male co-worker introduced her to other employees as the person in charge of "cookies

with sprinkles"; said that he hated "pushy, aggressive women" and that the plaintiff was such a woman; said that she was "made for the back seat of a car" and looked like a "dyke"; and subjected her to mistreatment that was not explicitly sex-based, such as hitting her with a clipboard. *Id*. at 836, 841. The court held that this conduct was not enough for the plaintiff to show that the alleged sex-based harassment was "objectively severe or pervasive." *Id*. at 841. As the court explained, "relatively isolated gender-based comments and remarks" and "occasional inappropriate comments … do not rise to the level of an objectively hostile work environment under Title VII." *Id*. at 835, 841.

In *Patt v. Family Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002), the Seventh Circuit held that eight gender-based comments over several years were not sufficiently severe or pervasive to support a hostile work environment. *Id*. at 754. The court likewise rejected a hostile work environment claim in *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333 (7th Cir.1993), where the plaintiff's supervisor jokingly called her a "dumb blond," placed his hand on her shoulder several times, placed "I love you" signs in her work area, attempted to kiss her, and asked her out on dates. *Id*. at 337. And in *Rogers v. City of Chicago*, 320 F.3d 748 (7th Cir. 2003), the Seventh Circuit affirmed summary judgment where the plaintiff "c[ould] prove little more than that she encountered a number of offensive comments over a period of months … [and] experienced one incident of physical contact." *Id*. at 753.

The conduct of which Dr. Johnson complains, while hardly admirable, is no worse than conduct the Seventh Circuit has held insufficient to ground a hostile work environment claim. It follows that summary judgment is warranted on her claim. *See Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649-50 (7th Cir. 2011) ("in situating plaintiffs' allegations among the case-law guideposts, their limited number of claims are insufficiently severe to support a hostile work

environment claim") (collecting cases); *cf. Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008)

("assaults within the workplace create an objectively hostile work environment for an employee

even when they are isolated"); *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006)

(holding that a hostile work environment claim could proceed where the plaintiff's co-worker

"made [vulgar] comments or gestures directly to [her] on a nearly daily basis and touched her on

half a dozen occasions").

The conduct of which Dr. Nash complains also falls short of being severe or pervasive.

The evidence at most shows that between 2003 and 2007, Dr. Nash had several arguments with

Dr. Crawford, some of which were sparked by her alignment with Dr. Johnson, and that Dr.

Nash observed Dr. Crawford treating Dr. Johnson poorly. A reasonable jury could not find from

this evidence that Dr. Nash satisfied the "severe or pervasive" element of her hostile work

environment claim. *See Scruggs*, 587 F.3d at 841; *Rogers*, 320 F.3d at 753; *Patt*, 280 F.3d at

754; *Weiss*, 990 F.2d at 337.

## III.     Termination – Race and Sex Discrimination Claims

Drs. Johnson and Nash allege that their terminations were due to race and sex

discrimination in violation of Title VII, and Dr. Johnson also presses an equal protection claim

under § 1983. "The same requirements for proving discrimination apply to claims under Title

VII … and § 1983." *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir.

2010). A plaintiff may avoid summary judgment through either the direct or indirect methods of

proof. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Drs. Johnson and Nash

pursue both methods, which are considered in turn.

-13-

A.      **Direct Method**

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting

sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus

motivated an adverse employment action." *Ibid*. Direct evidence would be "an outright

admission that an action was taken for discriminatory reasons." *Everett v. Cook Cnty.*, 655 F.3d

723, 729 (7th Cir. 2011); *see also Coleman*, 667 F.3d at 860. Circumstantial evidence is

"evidence that points to discriminatory animus through a longer chain of inferences." *Everett*,

655 F.3d at 729. Such evidence typically falls into one of three categories: "(1) ambiguous

statements or behavior towards other employees in the protected group; (2) evidence, statistical

or otherwise, that similarly situated employees outside of the protected group systematically

receive better treatment; and (3) evidence that the employer offered a pretextual reason for an

adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir.

2011); *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011). The

appropriate focus "is not whether the evidence offered is direct or circumstantial but rather

whether the evidence points directly to a discriminatory reason for the employer's action."

*Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also*

*Everett*, 655 F.3d at 729; *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th

Cir. 2011).

Plaintiffs contend that Dr. Gonzalez's (supposed) statement that Dr. Johnson was "just

another black physician troublemaker" constitutes direct evidence of discrimination. Doc. 265 at

12; Doc. 269 at ¶ 6; Doc. 265-8 at 36, ¶ 5. The contention is without merit. Precedent holds that

"[d]erogatory remarks based on an employee's race can be direct evidence of discrimination if

they are made by the decisionmaker (or by a person who influences the decisionmaker), near the

time of the decision to fire the employee, and in relation to the employee's discharge." *Ellis v. UPS, Inc.*, 523 F.3d 823, 829 (7th Cir. 2008). "A decisionmaker is the person responsible for the contested decision." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (internal quotation marks omitted).

Dr. Gonzalez's statement does not qualify as direct evidence of discrimination. It is undisputed that Dr. Simon, not Dr. Gonzalez, made the decision to terminate Drs. Johnson and Nash. Doc. 270 at 6; Doc. 265-1 at ¶ 31. Although Plaintiffs assert that Dr. Gonzalez "participated in a scheme to use the budget cuts to replace Provident's orthopedic surgeons with a Stroger surgeon," Doc. 265 at 12, the evidentiary material they cite does not support their assertion. Doc. 269 at ¶ 6; Doc. 265-8 at ¶ 5. Specifically, Plaintiffs cite Dr. Ivankovich's declaration that "Dr. Gonzalez said they were planning on getting rid of Dr. Johnson." Doc. 269 at ¶ 6; Doc. 265-8 at ¶ 5. Dr. Ivankovich does not specify to whom Dr. Gonzalez was referring when he said "they," and his declaration provides no evidence that Dr. Gonzalez influenced Dr. Simon's decision to terminate Drs. Johnson and Nash. Because Dr. Gonzalez was not the decisionmaker and because there is no evidence that Dr. Gonzalez influenced the actual decisionmaker, Dr. Gonzalez's statement is not direct evidence of discrimination. *See Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 835-36 (6th Cir. 2012) (evidence of racial animus by non-decisionmaker does not constitute direct evidence of discrimination absent evidence that the non-decisionmaker influenced the decisionmaker); *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1st Cir. 1998) (holding that a district manager's arguably discriminatory comment was not direct evidence of discrimination where the plaintiff "adduced no evidence that [the manager] had authority to determine whether [the plaintiff] was to be retained by Rite Aid, nor that [the manager] played any role in the decision to demote [the plaintiff] to key cashier").

With respect to circumstantial evidence, Plaintiffs rely on record materials that show essentially the following three facts. First, while Defendants created and then implemented a policy for determining which doctors would be terminated in conjunction with the budget cuts, Doc. 269 at ¶ 15; Doc. 265-8 at ¶ 7, Defendants did not follow that policy in deciding to terminate Drs. Johnson and Nash, Doc. 269 at ¶¶ 19-21. Second, while Defendants claimed that they planned to eliminate orthopedics at Provident, they did not in fact do so. *Id*. at ¶ 13. Third, although Defendants claimed that they did not consider doctors' individual characteristics in deciding who to terminate, Dr. Simon in fact considered Dr. Johnson's productivity. Doc. 265-1 at ¶ 33; Doc. 269 at ¶ 11; Doc. 215 at 72.

The only thing that can be inferred from this evidence is that Defendants' explanation for why Drs. Johnson and Nash were terminated is pretextual—that is, that the explanation is a lie rather than the true reason they were terminated. *See Diaz*, 653 F.3d at 588 (a supervisor's irregularly structured hiring process is evidence of pretext); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 531 (7th Cir. 2008) (pretext is shown by an employer's decision to hire new people after claiming that the plaintiff was terminated because her position was no longer necessary); *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 807 (7th Cir. 2008) (contemporaneous evidence conflicting with the employer's proffered justification is evidence of pretext); *Davis v. Wis. Dep't of Corrs.*, 445 F.3d 971, 976-77 (7th Cir. 2006) (an employer's failure to follow its own discipline policy is evidence of pretext); *Rudin v. Lincoln Land Comm. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (an employer's failure to follow its own employment policy demonstrates pretext). Plaintiffs do not argue otherwise; the section of their brief addressing circumstantial evidence under the direct method of proof focuses exclusively on pretext. Doc. 265 at 10-17.

Evidence "that the employer offered a pretextual reason for an adverse employment action" can *support* an inference of discrimination under the direct method. *Coleman*, 667 F.3d at 860 (internal quotation marks omitted). However, the Seventh Circuit has held that pretext evidence, standing alone, is insufficient under the direct method. In *Venturelli v. ARC Comm. Servs., Inc.*, 350 F.3d 592 (7th Cir. 2003), the court held that "[c]ircumstantial evidence under the direct method … must allow a jury to infer *more than* pretext; it must itself show that the decisionmaker acted because of the prohibited animus." *Id*. at 601 (emphasis added). The court reinforced the same point in *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295 (7th Cir. 2010):

> [A]ssuming Van Antwerp marshaled enough circumstantial evidence to show pretext, his claim of discrimination under the direct method would still fail. Evidence offered under the direct method must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus. Even if Van Antwerp had shown that the Department lied about the lack of an opening, he has pointed to no evidence that would raise an inference that the Department failed to transfer him because of his age, and we can find none. Without some minimal showing that the "real reason" for cancelling his transfer was based on age, Van Antwerp's direct claim fails.

*Id*. at 298-99 (internal quotation marks and citations omitted). It follows that Plaintiffs' circumstantial evidence does not permit them to forestall summary judgment under the direct method. *See Venturelli*, 350 F.3d at 601.

Plaintiffs cite several cases in arguing that "once the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated" is for the jury. Doc. 265 at 10-11 (quoting *Rudin*, 420 F.3d at 720); *see also id*. at 11, 13-14 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000); *Diaz*, 653 F.3d at 588; *Radentz v. Marion Cnty.*, 640 F.3d 754, 761 (7th Cir. 2011); *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1063 (7th Cir. 2008); *Davis*, 445 F.3d at 976-77; *Gordon v. United*

*Airlines, Inc.*, 246 F.3d 878, 890-91 (7th Cir. 2001); *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000)). That proposition, however, applies only under the indirect method of proof. With one exception, the cases cited by Plaintiffs involved the use of pretext evidence under the indirect method. This stands to reason, as a plaintiff can survive summary judgment under the indirect method without evidence of discriminatory intent. *See Rudin*, 420 F.3d at 725-26 ("at summary judgment," a plaintiff proceeding under the indirect method "is not required to establish pretext *and* provide evidence of a discriminatory motive by the defendant") (internal quotation marks omitted). Under the direct method, by contrast, "the focus … is whether the evidence points directly to a discriminatory reason for the employer's action." *Silverman*, 637 F.3d at 734 n.3 (internal quotation marks omitted); *see also Venturelli*, 350 F.3d at 601.

In one case cited by Plaintiffs, *Diaz v. Kraft Foods Global, Inc.*, *supra*, the plaintiffs survived summary judgment under the direct method based, in part, on pretext evidence. The plaintiffs in *Diaz*, whose positions at Kraft were being eliminated, were unable to apply for other positions at the company because their supervisor refused to consider them. 653 F.3d at 585. Relying on the direct method to show that they were shut out because they were Hispanic, the plaintiffs adduced evidence showing that their supervisor: (1) exhibited bias towards Hispanics by assigning them, but not non-Hispanic employees, disfavored tasks; (2) used an irregular hiring process to fill the available positions; and (3) stated that a different employee was hired because that employee was "white like [the supervisor]." *Id*. at 589. The Seventh Circuit held that this evidence—particularly the supervisor's comment about the race of the hired employee, which went far beyond the pretext evidence involving the use of an irregular hiring process—was sufficient to allow a reasonable jury to conclude that bias against Hispanics

motivated the supervisor's hiring decision. *See ibid.* (noting "the force of the … evidence, especially [the supervisor's] statement").

Here, by contrast to *Diaz*, the *only* circumstantial evidence Plaintiffs have pretext evidence. As the Seventh Circuit held in *Venturelli* and *Van Antwerp*, such evidence is insufficient under the direct method. *See Anderson v. Jewel Food Stores, Inc.*, 837 F. Supp. 2d 826, 831-32 (N.D. Ill. 2011).

### B.     Indirect Method

"Under the indirect method, the plaintiff carries 'the initial burden under the statute of establishing a prima facie case of … discrimination.'" *Coleman*, 667 F.3d at 845 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) (omission in original). "If she establishes a prima facie case, then the burden shifts to [Defendants] to articulate a legitimate, nondiscriminatory reason for her termination which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008) (internal quotation marks omitted). "If the employer meets this burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

To establish a prima facie case under the indirect method, a plaintiff must present evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Coleman*, 667 F.3d at 845 (internal quotation marks omitted) (alteration in original). This rule is modified in certain categories of cases. *See Michas v.*

*Health Cost Controls of Ill.*, 209 F.3d 687, 693 (7th Cir. 2000) ("recognizing the variety of adverse employment actions covered within the broad reach of the discrimination statutes, [the Seventh Circuit] ha[s] adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace"). One category consists of mini-reduction-in-force ("mini-RIF") cases, "where the dismissed employee's duties are absorbed by another employee or employees rather than eliminated." *Petts*, 534 F.3d at 725; *see also Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 n.5 (7th Cir. 2000) ("When a terminated employee's duties were absorbed by other employees rather than eliminated from the company altogether, we do not require the employee plaintiff to make out the prima facie case normally required for reduction in force cases."). The parties agree that this is a mini-RIF case. In such a case, "the court applies a modified version of the fourth prong of the prima facie case," requiring "proof that the plaintiff's duties were absorbed by employees not in the protected class." *Petts*, 534 F.3d at 725; *see also Michas*, 209 F.3d at 693 ("because the fired employee's duties are absorbed by other workers and the employee was 'replaced,' not eliminated, we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class"); *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493-94 (7th Cir. 2000) (same).

Plaintiffs argue that they have satisfied the fourth prong because their duties were absorbed by non-African-American, male surgeons. Doc. 265 at 20. To support this assertion, Plaintiffs cite their Local Rule 56.1(b)(3)(B) response to Paragraph 40 of Defendants' Local Rule 56.1(a)(3) statement. Paragraph 40 of Defendants' statement says: "On cutting oral and maxillofacial surgical services from Provident, Dr. Simon hoped that Stroger could accommodate those patients." Doc. 206 at ¶ 40. Plaintiffs' response says: "Not disputed. All of the oral maxillofacial surgeons at Stroger were male, and none were African-American. All of

the orthopedic surgeons at Stroger were male, and none were African-American." Doc. 265-1 at

¶ 40 (citations omitted). The second and third sentences of the response are extraneous to the

substance of Paragraph 40 of Defendants' statement. Paragraph 40 merely states that Dr. Simon

hoped that Stroger could accommodate the patients who otherwise would have received oral and

maxillofacial surgical services at Provident. Plaintiffs did not dispute that statement. But rather

than stopping there, they proceeded to recite facts regarding the sex and race of Stroger's oral

and maxillofacial surgeons and orthopedic surgeons. Those facts are not even arguably

responsive to Defendants' statement.

Defendants cry foul in their reply brief, arguing that the additional facts, smuggled as

they were into Plaintiffs' Local Rule 56.1(b)(3)(B) response, violate Local Rule 56.1(b)(3) and

should be disregarded. Doc. 270 at 4. Defendants are correct. Local Rule 56.1(b)(3)(B)

requires the non-movant to "respon[d] to each numbered paragraph in the moving party's

statement, including, in the case of any disagreement, specific references to the affidavits, parts

of the record, and other supporting materials relied upon." It is inappropriate for a non-movant

to include additional facts, meaning facts extraneous to the substance of the paragraph to which

the non-movant is responding, in a Local Rule 56.1(b)(3)(B) response. *See Ciomber v.*

*Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming the district court's

refusal to consider additional facts set forth in the non-movant's Local Rule 56.1(b)(3)(B)

response); *Eason v. Nolan*, 416 F. App'x 569 (7th Cir. 2011) (same). Rather, "Local Rule 56.1

*requires specifically* that a litigant seeking to oppose a motion for summary judgment file a

response that contains a separate statement" under Local Rule 56.1(b)(3)(C) "of any additional

facts that require the denial of summary judgment." *Cichon v. Exelon Generation Co.*, 401 F.3d

803, 809 (7th Cir. 2005) (omission in original) (quoting N.D. Ill. L.R. 56.1(b)(3)(C)) (internal

quotation marks omitted); *Parvati Corp. v. City of Oak Forest*, 2012 WL 957479, at *1 (N.D. Ill.

Mar. 20, 2012) ("Also, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a

*separate* statement of additional facts that requires the denial of summary judgment.") (emphasis

added). The second and third sentences of Paragraph 40 of Plaintiffs' Local Rule 56.1(b)(3)(B)

statement therefore will be disregarded. *See Ciomber*, 527 F.3d at 643; *Wojtanek v.*

*Consolidated Container Co.*, 2011 WL 4036126, at *5 (N.D. Ill. Sept. 12, 2011) ("[A] court may

disregard any additional facts in a party's response to the opposing party's statement of facts").

 This result is not inconsistent with *Sojka v. Bovis Lend Lease, Inc.*, __ F.3d __, 2012 WL

2765031 (7th Cir. July 10, 2012). In granting summary judgment, the district court in *Sojka*

declined to consider facts that the non-movant set forth in his Local Rule 56.1(b)(3)(C) statement

of additional facts but that were not separately discussed in the non-movant's brief. *Id*. at *2, 4.

The Seventh Circuit held that this was improper, explaining that facts properly presented by the

non-movant in a Local Rule 56.1(b)(3) statement need not be repeated in the non-movant's brief.

*Id*. at *4-5. By contrast to the non-movant in *Sojka*, Plaintiffs here did not properly present

additional facts regarding the race and sex of surgeons at Stroger under Local Rule 56.1(b)(3);

instead, as just explained, they presented those facts in their Local Rule 56.1(b)(3)(B) response

rather than in their Local Rule 56.1(b)(3)(C) statement. This unfairly deprived Defendants of a

vehicle under Local Rule 56.1 to dispute those facts, as the rule permits movants to reply only to

a Local Rule 56.1(b)(3)(C) statement, not to a Local Rule 56.1(b)(3)(B) response. *See* N.D. Ill.

L.R. 56.1(a)(3) ("If additional material facts are submitted by the opposing party pursuant to

section (b), the moving party may submit a concise reply in the form prescribed in that section

for a response. All material facts set forth in the statement filed pursuant to section (b)(3)(C)

will be deemed admitted unless controverted by the statement of the moving party."). *Sojka* did

not mention *Ciomber*, let alone disapprove its holding that the non-movant may not set forth additional facts in its Local Rule 56.1(b)(3)(B) response and that the district court may disregard such facts. 527 F.3d at 643.

Plaintiffs filed a motion to strike Defendants' request that the court disregard Paragraph 40 of Plaintiffs' Local Rule 56.1(b)(3)(B) response. Doc. 273. Plaintiffs first argue that Defendants' request is a motion and therefore failed to comply with Local Rule 5.3(b)'s notice requirement. That argument does Plaintiffs no good, for the court has broad discretion to strictly enforce Local Rule 56.1 regardless of whether a party requests such enforcement. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1"); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) ("there is nothing improper in the court enforcing [a local summary judgment] rule strictly, even if the parties themselves have not raised the matter"); *Speed Boats of Tex., LP v. Bank of Am., N.A.*, 2011 WL 759955, at *1 n.1 (N.D. Ill. Feb. 25, 2011) ("a party's choice not to raise [an opposing party's Local Rule 56.1 violation] does not preclude a district court from holding a party to account for such violations *sua sponte*"). Plaintiffs' next argument, that their response does comply with Local Rule 56.1, is wrong for the reasons set forth above. Finally, Plaintiffs ask the court to consider a revised version of their Local Rule 56.1(b)(3)(B) response. Doc. 273-2. The request is denied, as the proposed revisions are made to other paragraphs of Plaintiffs' Local Rule 56.1(b)(3)(B) response; no revisions are made to Plaintiffs' response to Paragraph 40 of Defendants' Local Rule 56.1(a)(3) statement.

As previously noted, to satisfy the fourth prong of their prima facie case under the indirect method, Plaintiffs must show that their job responsibilities were absorbed by individuals outside their protected classes. *See Petts*, 534 F.3d at 725. Plaintiffs have not properly

presented to the court any such evidence. Plaintiffs therefore cannot defeat summary judgment under the indirect method on their claims that their terminations were caused by race and sex discrimination in violation of Title VII and the Equal Protection Clause.

## IV. Termination – Retaliation Claims

### A. Dr. Ivankovich – Title VII and Equal Protection

In his Title VII retaliation claim, Dr. Ivankovich alleges that Defendants terminated him because he complained about their mistreatment of Dr. Johnson and because he refused to help them further discriminate against her. Doc. 16 at ¶¶ 63-68. Defendants do not argue for summary judgment on that claim in their motion or their initial brief. Docs. 205, 239. Their belated inclusion of that argument in their reply brief, Doc. 270 at 9-11, in unavailing. It is axiomatic that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, [the defendant] had the initial burden of identifying the basis for seeking summary judgment."). Defendants' failure to address the Title VII retaliation claim until their reply brief forfeits any argument they might have had for summary judgment on that claim. *See Narducci*, 572 F.3d at 324; *AB Volvo*, 349 F.3d at 389.

Defendants preserved their argument for summary judgment on Dr. Ivankovich's claim that the retaliation against him violated the Equal Protection Clause. Doc. 205 at 2; Doc. 239 at 23-24. That argument is correct. Dr. Ivankovich's "right to be free from retaliation for protesting … [race and] sex discrimination is a right created by Title VII, not the equal protection clause." *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989); *see also Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) ("the right to be free from retaliation may be

-24-

vindicated under the First Amendment or Title VII, but not the equal protection clause"). Summary judgment therefore is granted on Dr. Ivankovich's equal protection claim.

### B. Drs. Johnson and Ivankovich – First Amendment

Drs. Ivankovich and Johnson allege that Defendants violated the First Amendment by terminating them in retaliation for speaking out against the Bureau's proposed budget cuts. To succeed on a First Amendment retaliation claim brought, a plaintiff must show that: "(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions." *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). Defendants focus on the first requirement, arguing that Plaintiffs' speech is not constitutionally protected. "[T]he determination of whether speech is constitutionally protected is a question of law for the court." *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008).

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 US. 410, 417 (2006). However, "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 671 (7th Cir. 2009) (quoting *Garcetti*, 547 U.S. at 421) (internal quotation marks omitted). Accordingly, the speech of Drs. Johnson and Ivankovich is constitutionally protected only if (1) they spoke in their capacities as private citizens, as opposed to their capacities as Cook County physicians, and (2) they spoke on matters of public concern. *Ibid*. On this record, Plaintiffs' speech satisfies both requirements.

1.      **Speech as Private Citizens**

"Determining what falls within the scope of an employee's duties is a practical exercise that focuses on the duties an employee actually is expected to perform." *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008) (internal quotation marks omitted); *see also Morales v. Jones*, 494 F.3d 590, 596 (7th Cir. 2007). The inquiry turns on a "commonsense, contextual analysis of the role the public employee assumed in making the speech." *Ogden v. Atterholt*, 606 F.3d 355, 360 n.2 (7th Cir. 2010). A public employee's speech may be protected if it is "the kind of activity engaged in by citizens who do not work for the government," such as "writing a letter to a local newspaper, or discussing politics with a co-worker." *Garcetti*, 547 U.S. at 423-24. Speech generally is unprotected if made pursuant to an individual's employment responsibilities, where "there is no relevant analogue to speech by citizens who are not government employees." *Id*. at 424.

The Seventh Circuit applied these principles in *Wackett v. City of Beaver Dam*, 642 F.3d 578 (7th Cir. 2011), where a city employee alleged that the city retaliated against him for attending a public hearing to criticize its decision to purchase a particular tractor. In holding that the plaintiff was speaking in his official capacity, the court noted that he was responsible for overseeing the bidding process for the new tractor and that he and his boss, the director of the city agency in question, attended the hearing specifically to recommend that the Board vote to purchase a different tractor. *Id*. at 581-82. Likewise, in *Ogden v. Atterholt*, *supra*, the Seventh Circuit held that the plaintiff, a state agency's division manager, was speaking in his official capacity when he sent a memorandum to his supervisor requesting that his department be reorganized. The court characterized the memorandum as "an official request by a division manager, acting in that capacity, asking for a departmental reorganization—no more, no less."

606 F.3d at 360.  The court explained that the memorandum "reflect[ed] exactly the sort of localized employment-related speech *Garcetti* held was not entitled to First Amendment protection."  *Id*. at 359.

The Seventh Circuit reached a different result in *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370 (7th Cir. 2009).  The Milwaukee County sheriff, who had been criticized for using on-duty officers to escort him to the airport and to patrol his home, posted the following quote on a bulletin board: "If you are afraid or have lost your courage, you may go home, otherwise you will ruin the morale of others."  *Id*. at 373.  In response, the plaintiff, a deputy sheriff, published this statement in the police union's newsletter:

> If you are afraid or you have lost your courage and need two deputies and a sergeant to escort you every time you fly in and out of the airport and patrol deputies to drive by your house when you're out of town you should resign and go home!  Then you would lift the morale of this whole department (a.k.a. office).

*Id*. at 373-74.  The newsletter was distributed to current and retired union members, as well as to private businesses, sponsors, and the Milwaukee County Board of Supervisors.  The Seventh Circuit held that the deputy was speaking as a citizen because he "drafted his statement while off-duty, he reported the conduct externally, and no evidence indicates that the speech was 'pursuant to' or 'owe[d] its existence to' his official duties."  *Id*. at 377 n.3 (quoting *Garcetti*, 547 U.S. at 421).  Likewise, in *Matrisciano v. Randle*, 569 F.3d 723 (7th Cir. 2009), the Seventh Circuit held that the plaintiff, an Assistant Deputy Director of the Illinois Department of Corrections, was not speaking pursuant to his official duties when he testified at a prison review board hearing in support of an inmate's release.  The court explained that the plaintiff "voluntarily testified before the Board on a day that he took off from work," and that his "job description does not hint at voluntary testimony before the Board."  *Id*. at 731.

Using these precedents as guideposts, it is clear that Drs. Johnson and Ivankovich were speaking in their capacities as private citizens and not pursuant to their official responsibilities. They were not employed in policymaking positions when they spoke. Doc. 269 at ¶ 38. Rather, their job responsibilities were limited to the operations of the Division of Orthopedic and Podiatric Surgery at Provident. *Ibid.*; Doc. 265-7 at 12; Doc. 265-4 at 82. There is no evidence that Dr. Johnson was on duty when she attended the two rallies, spoke to Operation PUSH representatives, or spoke at a community meeting. Likewise, there is no evidence that Dr. Ivankovich was working when he was interviewed by the *Tribune*. Contrary to Defendants' contention, the evidence does not establish that "Plaintiffs' responsibilities included advocating for funding to their division." Doc. 239 at 18. Their job descriptions make no mention of budgeting matters, Doc. 265-7 at 12; Doc. 265-4 at 82, leaving no reason to believe they were responsible for publicly (or privately) advocating about the Bureau's budget.

Dr. Ivankovich's testimony that "[w]hen we go to the media, we're physicians," Doc. 222 at 91, does not warrant a different result. Just because Drs. Ivankovich and Johnson were speaking as *physicians* does not mean they were speaking in their capacities as *Cook County* physicians. The Supreme Court "has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. In *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), the Court addressed whether a public school teacher's letter to a local newspaper discussing his school board's funding policies was constitutionally protected. In holding that it was, the Court explained: "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak

out freely on such questions without fear of retaliatory dismissal." *Id*. at 572. The Court has since observed that "[t]he same is true of many other categories of public employees." *Garcetti*, 547 U.S. at 421. As physicians, Drs. Johnson and Ivankovich had "informed and definite opinions as to how funds allotted to the operations of [Cook County hospitals] should be spent." And as in *Clarke*, the only connection between Plaintiffs' speech and their employment was that they knew of the potential effects of the budget cuts through their positions at Cook County. *See Clarke*, 574 F.3d at 377 n.3 ("The only connections between Schuh's speech and his employment were that Sheriff Clarke was his superior and that he learned of Clarke's conduct through his position as a deputy."). These connections are not enough to render their speech non-private. *See ibid*.; *Matrisciano*, 569 F.3d at 731; *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009).

Nor does *Davis v. Cook County*, 534 F.3d 650 (7th Cir. 2008), warrant a different result. In *Davis*, a Cook County emergency room nurse sent a memorandum to the hospital's Employee Assistance Counselor and hospital officials expressing concern that "the ER was operating without any team-work and professionalism." *Id*. at 653. The Seventh Circuit concluded that the nurse wrote the memo in her capacity as a public employee because "[t]he issue she discusses in the memo concern particular job responsibilities of a registered nurse." *Ibid*. Unlike the nurse in *Davis*, Drs. Johnson and Ivankovich were addressing issues that extended beyond their particular job responsibilities. Dr. Johnson's speech addressed how the potential budget cuts would impact a variety of hospital departments, Doc. 269 at ¶ 3, and the community as a whole, Doc. 265-1 at ¶¶ 87-88, 90, 93. Dr. Ivankovich's interview with the *Tribune* focused on Provident's Medicaid and Medicare billing practices. In *Davis*, there was evidence that one of the nurse's responsibilities was to "act as an advocate," 534 F.3d at 653, and the Seventh

-29-

Circuit concluded that she was doing just that in her memorandum. By contrast, there is no evidence here that Dr. Johnson was responsible for Provident's or the Bureau's budgets or that Dr. Ivankovich was responsible for Provident's billing practices.

For these reasons, Drs. Johnson and Ivankovich were speaking in their capacities as private citizens, not pursuant to their official responsibilities. Perhaps reasonable people in the individual defendants' shoes could have come to a different conclusion. But because Defendants do not argue for qualified immunity, either in their initial brief or their reply brief, there is no need to run that question to ground. *See Narducci*, 572 F.3d at 324 ("the district court was entitled to find that [the defendants] waived the qualified immunity defense in the summary judgment proceedings because they failed to raise the issue before their reply brief"); *Bakalis v. Golembeski*, 125 F.3d 576, 579 (7th Cir. 1997) (same).

## 2. Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). "In analyzing the 'content, form, and context of a given statement' to determine if the statements are constitutionally protected," the Seventh Circuit "ha[s] stressed that content is the most important." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) (internal quotation marks omitted).

Defendants do not dispute that the Bureau's budget cuts were a matter of public concern. Instead, Defendants maintain that Plaintiffs' speech is not protected because their motive for opposing the budget cuts was to save their jobs. Doc. 239 at 20. Governing precedent holds that "[a]lthough [courts should] consider the motive of the speaker as part of the 'context' in which the speech was made, … speech of public importance is only transformed into a matter of private

concern when it is motivated *solely* by the speaker's personal interests." *Chaklos*, 560 F.3d at

714; *see also Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) ("the motive of the speaker is a

relevant, though not dispositive, factor because the speech will not be protected if the *only* point

of the speech was to further some purely private interest") (emphasis added) (internal quotation

marks omitted). "[T]he fact that the speaker was *partly* motivated by personal concerns does not

necessarily mean the speech cannot also be a matter of public concern." *Ibid.* (emphasis added).

Dr. Johnson expressed herself about the proposed budget cuts several times. The record

shows that she was not motivated solely (or even largely) by her personal interests. When

speaking at the 2006 community meeting, Dr. Johnson addressed the impact of budget cuts on

patient care, specifically addressing the importance of pediatrics and of obstetrics and

gynecology, as those departments were being considered for elimination at Provident. Doc. 269

at ¶ 3; Doc. 265-5 at 18-19. When appearing as a guest on a local radio show, Dr. Johnson

expressed her concern about the community impact of the budget cuts and, in particular, about

the loss of the obstetrics department. Doc. 269 at ¶ 3; Doc. 265-5 at 29. During meetings with

Operation PUSH, Dr. Johnson again addressed the impending budget cuts as well as the

differences between Stroger and Provident hospitals, noting that 90% of the Bureau's African-

American physicians worked at Provident or in the ambulatory care system. Doc. 265-1 at ¶ 88;

Doc. 209 at 147. And when interviewed on television during one of the two rallies she attended,

Johnson said that a 50% cut at Provident "would be a cut to the bone." Doc. 265-1 at ¶ 93; Doc.

209 at 171. Given this evidence, Dr. Johnson's speech was motivated, at least in part, by the

impact the budget cuts would have on the community. It follows that her speech was not

entirely motivated by her personal interests, and therefore that it is protected by the First

Amendment. *See Clarke*, 574 F.3d at 380 (explaining that in *Chaklos*, although "[t]he

-31-

employees' purpose in speaking was mixed, the [speech's] content contained matters of public interest, and the speech deserved protection under the First Amendment"); *Houskins*, 549 F.3d at 490 ("[t]he fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern").

The same holds for Dr. Ivankovich's speech. Dr. Ivankovich's interview with the *Tribune* focused exclusively on the Bureau's billing practices. The *Tribune* reported that 39% of the bills the Bureau submitted to Medicaid for reimbursement were rejected due to errors made by poorly trained staff. The article went on to quote Dr. Ivankovich as saying that the addition of a social worker and someone to process paperwork would lead to "millions of dollars from Medicaid and Medicare a year." Doc. 265-4 at 201.

"It is … well established that speech protesting government waste addresses a matter of public concern and is therefore entitled to constitutional protection." *Chaklos*, 560 F.3d at 713; *see also Valentino*, 575 F.3d at 671-72. Whether the Bureau was being "run in an efficient and effective manner is clearly an important matter of public concern." *Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003). Dr. Ivankovich's statements to the *Tribune* addressed the Bureau's inefficient billing practices, and "[a]n employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government … inefficiency." *Ibid*. Given this, Dr. Ivankovich's speech was not motivated solely by his own personal interest in saving his job.

### 3. *Monell* Liability

Drs. Johnson and Ivankovich bring their First Amendment retaliation claims not only against the individual defendants, but also against Cook County. "Municipal agencies can be found liable under § 1983 for violating a plaintiff's civil rights through (1) an express municipal

policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) (internal quotation marks omitted). Plaintiffs contend that Cook County is liable because Dr. Simon had final policymaking authority.

"State law determines who legally constitutes a final policymaker." *Id.* at 629. "In order to have final policymaking authority, an official must possess [r]esponsibiltiy for making law or setting policy, that is, authority to adopt rules for the conduct of government." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003) (internal quotation marks omitted). "Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Valentino*, 575 F.3d at 676 (internal quotation marks omitted). Pertinent to those inquiries are a municipality's "relevant customs and practices having the force of law" and its "positive law, including ordinances, rules and regulations." *Ibid.* (internal quotation marks omitted). The question whether Dr. Simon had final policymaking authority presents an issue of law for the court. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury."); *McNabola v. Chi. Trans. Auth.*, 10 F.3d 501, 510 (7th Cir. 1993) ("the Supreme Court explained that prior to submitting a case to the jury, the court must determine the identity of the official policymakers and that once the policymakers have been identified, 'it is for the jury to determine

whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur …'") (quoting *Jett*, 491 U.S. at 737).

Defendants argue that Dr. Simon did not have final policymaking authority because he needed approval from the Cook County Board to eliminate a department or division within the Bureau. Doc. 216 at 23. Defendants' conclusion does not follow from their premise. The question under *Monell* is not whether Dr. Simon had final authority over the elimination of departments or divisions in the Bureau, but whether he was the final policymaker on *personnel* decisions, including whom to terminate when implementing the budget cuts. *See Valentino*, 575 F.3d at 676 ("Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue; here, the relevant question is whether Mayor Owen is a policy-maker on personnel decisions.") (internal quotation marks omitted).

On that question, the record shows that Dr. Simon was the final policymaker on personnel decisions. "Defendants do not point to any laws, statutes, or ordinances which place [personnel] policy setting authority in the hands of the [Board]." *Valentino*, 575 F.3d at 677. Moreover, the Board's decision to eliminate Provident's orthopedic surgery and oral and maxillofacial surgery departments did not automatically result in the terminations of Drs. Johnson and Ivankovich. To the contrary, Dr. Simon testified that he was responsible for implementing the Board-approved budget cuts, a responsibility that included deciding how termination decisions would be made and which physicians would be terminated. Doc. 269 at ¶ 1; Doc. 265-5 at 140.

The Bureau's bylaws, which the Board approved in 2000, Doc. 265-6 at 81, further support the conclusion that Dr. Simon had final policymaking authority on the personnel

decisions at issue in this case. The bylaws state that "[e]ach Affiliate Hospital … shall have a Chief Operating Officer" and that "*[s]ubject to the authority of the Chief of the Bureau*, the authority and duties of the Chief Operating Officer shall include … [t]he selection, supervision, and discharge of employees and the development and maintenance of personnel policies and practices." *Id*. at 82-84 (emphasis added). Provident is one of the Bureau's affiliate hospitals. Doc. 265-1 at ¶ 10. A person has final policymaking authority if he has authority to set policy for hiring and firing. *See Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) ("There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."). By approving the bylaws, the Board delegated to Dr. Simon the authority over hiring and firing. And because Dr. Simon had final policymaking authority with regard to personnel decisions, Cook County may be held liable if the jury finds that Dr. Simon terminated Drs. Johnson and Ivankovich in violation of the First Amendment. *See Valentino*, 575 F.3d at 678.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion (Doc. 205) is granted in part and denied in part. Summary judgment is granted as to Dr. Nash's and Dr. Johnson's termination claims under Title VII and the Equal Protection Clause, Dr. Ivankovich's retaliation claim under the Equal Protection Clause, and Dr. Nash's and Dr. Johnson's Title VII hostile work environment claims. The summary judgment motion otherwise is denied. Plaintiffs' motion to strike Defendants' motion to strike (Doc. 273) is denied. This case will proceed to trial on Dr. Johnson's and Dr. Ivankovich's First Amendment retaliation claims, Dr.

Ivankovich's Title VII retaliation claim, and Dr. Johnson's and Dr. Nash's Title VII and Equal

Pay Act wage discrimination claims.

July 16, 2012

_____
United States District Judge